MARGARET G. DUNHAM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74183. Filed January 31, 1961.

*Fred L. Rosenbloom, Esq.*, and *Thomas P. Glassmoyer, Esq.*, for the petitioner.

*Paul D. Ritter, Esq.*, for the respondent.

WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioner for the years 1954, 1955, and 1956 in the respective amounts of $18,394.08, $15,850.52, and $26,845.40. The sole issue is whether dividends paid to petitioner in accordance with an

assignment thereof by her son and daughter are income to her and taxable as such.

FINDINGS OF FACT.

The stipulated facts are found as fact.

Petitioner resides at Scranton, Pennsylvania, and filed her individual income tax returns for the years here involved with the district director of internal revenue at that city.

Petitioner is the widow of James H. Dunham, Sr. (hereinafter referred to as Dunham, Sr.), who in 1905 was one of the three incorporators of Eureka Specialty Printing Company. In the late 1930's he caused his stock in Eureka to be placed in the names of himself and petitioner, his wife.

On December 22, 1941, the stock so held by petitioner and her husband was transferred on the books of Eureka and certificates issued for 2,500 shares to Dunham, Sr., and 2,500 shares to petitioner. Eighteen shares were transferred to J. H. Dunham, Jr. (hereinafter referred to as the son or Dunham, Jr.), and an additional 17 shares were transferred to petitioner. On December 24, 1941, petitioner and her husband each transferred 2,500 of their respective shares of stock in Eureka one half to each of their two children, a son and daughter who were adults. On December 30, 1941, the son and daughter entered into separate but identical agreements as "grantor" with certain named individuals as "trustees."[1] The agreements provided that the "trustees" were to hold in their possession the respective Eureka stock certificates of the "grantors" which were stated to have been delivered to the "trustees" upon execution of the agreements. Dunham, Jr., did so deliver his Eureka stock certificate endorsed in blank for transfer. His sister, however, at no time during the years at issue voluntarily delivered her Eureka stock certificate to the "trustees."

The agreements provided that the certificates of stock should be held by the "trustees" in the respective names of the son and daughter until directed by "the grantor" to transfer the particular certificate to the names of the "trustees" or until the prior death of the "grantor." Each "grantor" retained the right to vote the stock. However, on December 30, 1941, the daughter executed a power of attorney authorizing her right to vote her stock to be exercised by Dunham, Jr., her brother. The agreements further provided that they constituted irrevocable assignments to petitioner during her lifetime of all income paid or to be paid from the stock, possession of which was held by the "trustees"; that neither the "grantors" nor the "trustees" were to have any interest in such income during petitioner's lifetime; that the same was to be paid directly to her by Eureka and that petitioner

---

[1] In this opinion, unless otherwise indicated, the terms "grantor," "trustees," and derivatives thereof are used for convenience and not as legal conclusions.

was to pay the income tax upon all income from the stock. Upon the death of petitioner, the income was to be paid to Dunham, Sr., during his lifetime. Upon the death of the survivor of Dunham, Sr., and petitioner before the death of the "grantor," the "trust" was to terminate and the stock to be delivered to the "grantor." If the "grantor" were to predecease the survivor of his parents, the trust could not be terminated until the death of the survivor of them, and the "trustees" were in that event to transfer the securities to their (the "trustees'") names for the purpose of distribution after the death of the surviving parent to certain named beneficiaries of the respective "grantors." Upon the death of a "grantor" prior to termination of a "trust," the "trustees" were to confer with the parents or their survivor relative to the voting of the stock. The agreements further provided that in any case where, under their terms, the "trustees" were authorized to transfer the securities to their own names and divide the stock, they were permitted to do so either in kind or to sell the stock and distribute cash, the judgment of the "trustees" as to value being binding on all parties concerned. If the respective "grantors" died prior to termination of the respective "trusts" and the "trustees" decided to sell the stock, they were empowered to reinvest the proceeds but only in accordance with the written direction of either of the parents or the survivor of them. Upon such reinvestment, all income of the trust was to be paid to petitioner for her life, then to Dunham, Sr., for life, and after the death of their survivor, the trust was to terminate. Each agreement by its terms was made irrevocable.

Simultaneously with the execution of the December 30, 1941, agreements above described the son and daughter, by written assignments, transferred all of their respective rights, title, and interest in and to all income, either cash dividends or stock dividends, and all moneys "produced" by the securities to their parents. At the same time Dunham, Sr., assigned his rights thereunder to petitioner.

On the same date, the "trust" agreements and the assignments above referred to, together with the stock of Dunham, Jr., were delivered to the "trustees" and were thereafter held by them in a safety-deposit box.

On April 21, 1942, Dunham, Sr., died.

In 1950 Eureka declared and paid a stock dividend of 1 share of common stock for 1 share of like stock outstanding and increased its capitalization to 30,000 shares of common stock. The new stock was issued in the respective names of the "grantor" children and receipted for by them. The daughter has never endorsed the stock so issued to her and retained possession of it until the summer of 1956.

On July 28, 1954, Dunham, Jr., petitioner, and the "trustees" exe-

cuted a modification of the "trust" agreement of December 30, 1941, made by Dunham, Jr., wherein the "trustees" were given the sole right to vote any stock of the "grantor" then held by them or thereafter deposited with them. Thereafter, on August 26, 1954, all Eureka stock theretofore issued and standing in the name of Dunham, Jr., hereinbefore referred to in the aggregate of 5,000 shares, was transferred on the books of Eureka and reissued in the names of the "trustees."

On July 1, 1956, Eureka was again recapitalized, each shareholder receiving in exchange for each common share held by him 1 share of class A voting stock and 1 share of class B nonvoting stock, each having a par value of $25. Both classes represent common stock. During September and October of that year the daughter surrendered to Eureka all stock in that company hereinbefore mentioned as having been issued to her. Class A and class B common stock in accordance with the plan of recapitalization was issued in her name in exchange for the stock surrendered, but the reissued stock was delivered to the "trustees" and has since been held in their custody. Stock then standing in the names of the "trustees" which theretofore had been transferred to them by Dunham, Jr., was surrendered to Eureka and new stock issued in their names in accordance with the recapitalization plan.

Petitioner has owned in her own right, not acquired from her son or daughter or the "trustees," certain Eureka stock since January 1, 1954, until December 1, 1956, and during the latter month made gifts to her grandchildren of a portion thereof.

Eureka paid dividends of $4.25 per share in 1954; $5 a share in 1955; and $3.75 a share in 1956. Petitioner actually received dividend income from Eureka stock in the amounts of $43,587.96 in 1954; $51,280 in 1955; and $76,920 in 1956. These amounts consisted of dividends paid on Eureka stock held in trust and standing in the names of Dunham, Jr., Hester D. Connell (daughter of petitioner), or the trustees in the amounts of $42,499.96 in 1954; $50,000 in 1955; and $75,000 in 1956; and dividends paid on the shares standing in petitioner's own name in the amounts of $1,088 in 1954; $1,280 in 1955; and $1,920 in 1956.

Although petitioner actually received dividends from Eureka stock in the amounts of $43,587.96, $51,280, and $76,920 in the years 1954 to 1956, respectively, she only reported dividend income from Eureka stock in the amounts of $10,238, $26,280, and $28,908 on her Federal income tax returns for 1954, 1955, and 1956, respectively.

None of the stock issued by Eureka in excess of that surrendered which was theretofore standing in the names of Dunham, Jr., and his sister was issued in the name of or to petitioner.

*Ultimate Findings.*

No cash dividend upon Eureka stock held by the "trustees" was paid to or through the "trustees" but was paid by the company directly to petitioner.

The agreements of December 30, 1941, whereby custody of their Eureka stock was stated to be transferred to the "trustees" by Dunham, Jr., and his sister, did not constitute trusts within the meaning of subpart E, chapter 1, and section 652 of the Internal Revenue Code of 1954 but did constitute mere assignments of the income from such stock to petitioner.

OPINION.

The issue here presented is whether the assignee of dividends from shares of corporate stock for life is the taxpayer upon such income or whether the assignor is properly chargeable therewith. Petitioner contends the proper taxpayers are the assignors. Respondent has based his finding of deficiencies upon the determination that petitioner, the assignee, is properly to be regarded as the taxpayer.

If the assignors created trusts to carry out the purposes of the assignments of stock dividends, sections 651, 652, and 671 through 678 of the 1954 Code must be considered in arriving at our decision. If no such trusts were created, decision must follow applicable case law. That no such trusts were created within the meaning of sections 651 and 652 is readily apparent from examination of those sections. Section 652 relates only to such trusts as are described in section 651 and only then in the event the income of such trusts is "required to be distributed currently." Section 651 describes only a trust "the terms of which * * * provide that all of its income is required to be distributed currently, and * * * do not provide that any amounts are to be paid, permanently set aside, or used for" charitable purposes. It is clear here that by the express terms of both "trust" agreements the "trustees" were to have no interest in or control over the income from the involved stock whatsoever and that such income was to be paid by the corporation directly to petitioner. We think it follows that sections 651 and 652 have no application to this issue. It also follows that the income received by petitioner, if chargeable to her, is not to be so charged under those sections. Sections 671 through 678 constitute subpart E of chapter 1 of the 1954 Code and deal with specific conditions relating to trusts whereunder either the grantors or the beneficiaries of trusts are to be treated as the owners of the trust corpus or income. Such trusts are characterized by a trust corpus and income, current, future, or both, produced by the trust corpus. Subpart E of chapter 1 relates and is applicable only to such trusts. We find none of the sections comprising subpart E have application to

the "trust" instruments executed by the "grantors" herein. If those instruments created trusts under either State or Federal law, they are clearly mere custodial arrangements. So far as Dunham, Jr., is concerned, the "trust" remained custodial in character until August 26, 1954, when he modified the arrangement by placing his stock in the names of the "trustees," the effect of which is discussed *infra*. Neither "grantor" regardless of the use of trust phraseology conveyed an interest in his or her stock, equitable or otherwise, to the trustees. Until the death of either grantor prior to that of petitioner or until the death of petitioner prior to that of a respective grantor, the "trustees" had no trust function other than as mere custodians of property. They had no power to manage or vote the "trust corpus." That power or right was retained by the "grantors" until July 28, 1954, when the son conveyed the right to vote his stock to the "trustees." The daughter still retains the right to vote her stock limited by her revocable power of attorney to do so granted to her brother December 30, 1941. The "trustees" possessed no right to alienate the stock of which they were given custody although it is true that their physical possession thereof did operate at least as a practical limitation upon the exercise of that power by the "grantors." They possessed no interest in or control over the dividends produced by the Eureka stock. Possessing none of the above-enumerated incidents of ownership of the stock, they cannot be held to be trustees of a trust within the meaning of that term as used in subpart E of chapter 1 of the 1954 Code. The provisions of subpart E certainly have no bearing upon the facts of this case prior to July 28, 1954, and then only with respect to that portion of petitioner's stock income represented by stock originating with Dunham, Jr., in case it should develop that his modification of the "trust" agreement on that date sufficiently alters its nature so that it constitutes a trust within the meaning of subpart E.

Decision of this issue with respect to dividends originating from stock in the name of petitioner's daughter for all years at issue and dividends originating from stock standing in the name of her son at least prior to July 28, 1954, must depend upon the principles enunciated in *Helvering* v. *Clifford*, 309 U.S. 331; *Blair* v. *Commissioner*, 300 U.S. 5, affirming 31 B.T.A. 1192; *Helvering* v. *Horst*, 311 U.S. 112, affirming 39 B.T.A. 757; *Harrison* v. *Schaffner*, 312 U.S. 579; *Arthur T. Galt*, 19 T.C. 892, affirmed on this issue 216 F. 2d 41 (C.A. 7). *Helvering* v. *Clifford, supra,* and *Lucas* v. *Earl*, 281 U.S. 111, establish the principle that income is to be taxed to the earner thereof. The *Blair* case stands for the principle that where an interest in property (the tree) is indistinguishable from the income (the fruit) therefrom, an assignment of the income constitutes an assignment of the property

which gave rise to it. The *Horst* case enunciates the broad principle, foreshadowed in the *Clifford* and *Earl* cases, that an assignor of the fruit of the tree may not escape taxation thereon unless he concomitantly assigns the tree upon which it grew. In cases subsequent to *Horst* the holding in that case has been somewhat tempered until, as in the *Schaffner* case, it has developed that the onus of income tax upon the fruit does not necessarily fall only upon him to whom the entire tree has been assigned, but may fall upon him or not, depending upon how much, if any, of the tree has been transferred to him. Does there remain in the income assignor's hands either directly or indirectly sufficient command of either the tree or its fruit so that in making a gift of the fruit he is to be regarded as having thereby reaped sufficient benefit from the assignment of the fruit to be chargeable with the tax thereon as owner?

The daughter during all the years at issue and the son until July 28, 1954, had conveyed nothing but the income from their Eureka stock to petitioner. They clearly retained all of the remaining incidents of ownership therein except for the power of appointment which they had irrevocably exercised by the execution of the "trust" agreements. They, in fact, through their voting rights in the stock, held a substantial right to influence not only the amount but the very existence of dividends thereon. Petitioner had no rights exercisable by her as against Eureka, the issuer of the stock, and could require of it no accounting other than for declared dividends. Cf. *Blair* v. *Commissioner, supra.* She had no interest, equitable or otherwise, in the tree which bore the fruit which had been assigned to her. If the fruit grew, it was hers, but if it did not, she was powerless to influence its growth. For all years at issue with respect to dividends from Eureka stock standing in the name of her daughter and that of her son to July 28, 1954, petitioner is not to be taxed as the owner thereof.

On August 26, 1954, the son authorized the "trustees" to exercise his endorsement of his Eureka stock certificates by taking record title in their own names for the purposes of the "trust." Thereafter one of those purposes became the right to vote the stock by virtue of the son's July 28, 1954, modification of the "trust" agreement. After August 26, 1954, Dunham, Jr., held only a reversionary interest in the stock contingent upon the death of both his father, who had died on April 21, 1942, and his mother prior to his own death. It thus becomes apparent that from July 28, 1954, through the years at issue, petitioner being still alive, she, not her son, has held an equitable interest in the stock itself and through the trustees is entitled to influence her income from its dividends at least to the same extent as her son could have theretofore done. She is therefore taxable as owner upon the dividends derived from Eureka stock originating from her son, Dun-

ham, Jr., from and after that date for the remainder of the years at issue in accordance with the principles laid down by *Blair* v. *Commissioner, supra.*

Section 641 of the 1954 Code makes it clear that the trusts within the framework of chapter 1 thereof are *income-distributing* trusts. It follows therefore that subpart E of chapter 1 has no application to this issue even subsequent to the modification of the son's "trust" for the reason that the "trust" even then clearly held no interest or right to control the income from the stock originating with either the son or daughter.

*Decision will be entered under Rule 50.*